Okay, sorry, we were just checking. Welcome. Good to have everybody here. I know that you all are aware of all of this, but I will remind you that when you're talking, when it gets down to yellow, you only have two more minutes. When it's red, that means you're done, unless we're still asking. If we're still asking, you have to keep answering. If we're not, you need to finish your sentence and sit back down. So that's how that works. So we'll start with this first one, case number 24-60650, Starbucks Corporation v. National Labor Relations Board, and we have Amy Saharia for Starbucks. Am I pronouncing it? Saharia. Saharia? Yes. Okay. Good morning, and may it please the Court, Amy Saharia of Williams and Connolly for Petitioner Starbucks Corporation. The decision below improperly second-guesses Starbucks' operational decisions in its Buffalo market during a union campaign. When executives came to Buffalo in part to exercise the company's First Amendment right to discuss unionization with employees, they encountered poor conditions, ineffective managers, infect infestations, poorly trained employees, and understaffed stores, none of which the other side disputes. When they discovered these problems, Starbucks set out to fix them. It fired the district manager, and it made operational changes, as it does all across the country. The Board's conclusions that Starbucks' decisions violated the NLRA rest on improper legal shortcuts. The Court should deny enforcement or, at a minimum, vacate and remand. Now, before jumping into the substance, I thought I might propose a framework for how the Court can go about digesting and resolving this case, given the size of the record. And just as a note, the one reason for the size of this record is that the Board consolidated what were 33 separate cases into this one massive proceeding, which explains the length of the decision below. And so I thought I might just propose a framework for how to go about deciding the case. As the Court knows, there are two categories of alleged unfair labor practices. There are the 8A1 allegations, which involve alleged coercion of union activity. And then there are the 8A3, 8A4, 8A5 allegations, which largely involve alleged discrimination against union supporters. I'm well aware that there's a lot of stuff, and obviously we've been reviewing it and trying to get through it, but I'm not going to pretend I've read every single page in this case. I'm wondering, what is the real problem for you all? If we just affirmed, what problem would that be for Starbucks? What's the biggest problem, and what is the biggest thing that could help you all get it back to, quote, normal? Sure. I mean, the problem for Starbucks is that this decision below took ordinary operational decisions in a market during a union campaign and turned virtually all of them into unfair labor practices, to the point of the absurd. So one example, the board held that when a manager told an employee that he was supposed to put milk back in the fridge in between uses, that somehow violated the NLRA. The board held that ridding stores of bees and fruit flies violated the NLRA. These are the kinds of things that employers have to be able to do during union campaigns without running afoul of labor law. And the same goes for the various disciplinary actions that Starbucks took in this market during this time. The board held that every single disciplinary action taken against a union supporter, no matter how mundane, how minor, all the way up to discharges, violated the act, unless Starbucks could find a comparator in the very same store before August 23rd. That just completely inverts the way that the board typically analyzes Section 883 claims, where the general counsel bears the burden to prove animus, and it has to prove animus on a decision-by-decision basis, as opposed to just inferring animus in the abstract and flipping the burden on the employer to disprove animus. If that were the standard, it would be impossible to take disciplinary actions against any union supporters during a union campaign. Now, with respect to how to go about digesting this large record, what I would submit is that as to the Section 81 allegations, the bulk of those, and these are at RE 94 to 100, involve alleged soliciting of grievances and extending of benefits, and these benefits are the operational decisions, like how we conducted training, how we staffed the stores, and things of that nature. And we think those all suffer from cross-cutting errors, and the court could simply identify those errors, vacate, and remand back to the board without having to analyze them one by one, since the standard remedy for legal error is to vacate and remand. There are then a few other categories of 81 allegations that embody them. Well, I want to ask you about the Galleria kiosk. Yes, Your Honor. Isn't that something y'all still own, that little arena in that mall? No, Your Honor. You don't still own it? No, we do not own the kiosk, and the ALJ recognized that we do not own the kiosk. You're not still renting it? No, Your Honor. And so if that order remained, is the problem that trying to go back to the mall and get that arena is a hard thing to do? Yeah, the problem is that the order itself compels Starbucks to restore and reopen that kiosk as it existed in 2021. It does not order Starbucks, for instance, to make reasonable efforts to negotiate with a mall owner to try to restore the kiosk. It simply orders Starbucks to do that. And the ALJ himself recognized that this is now a licensed location, meaning the mall owns that kiosk. They simply have a license from Starbucks. It is no longer a company-owned or operated store, which is what it was in September of 2021. Now, with respect to the kiosk, I think the kiosk is a great example of the improper shortcuts that the board took under Section 8A.3, which are all of these alleged discrimination allegations. The closing of the kiosk, the discipline of employees telling employees to put milk pack in the fridge. What the board did is it simply inferred animus district-wide without going through the normal decision-by-decision animus analysis that this court's precedent required. It didn't ask, for instance, whether any given decision-maker who made these decisions had anti-union animus or was animated by anti-union animus. Again, it just inferred animus across the entire district and then required Starbucks to somehow disprove that animus. Didn't you have a significant number of employees who were disciplined or terminated who were also union supporters? There were employees who were both union supporters and non-union supporters who were disciplined during this time. There's a chart in the ALJ's decision at RE92-94 that gives a long list of non-union supporters who were also disciplined during this time. And the ALJ did not do anything with that evidence that Starbucks was disciplining both union supporters and non-union supporters. Now, one reason why this discipline occurred, as the ALJ noted, is that employees across Buffalo were largely not in compliance with pre-existing policies, so policies related to dress code, time and attendance, profanity, etc. Some store managers were enforcing those policies, some were not. So those alleged infractions had been going on before Starbucks made a decision to descend on the Buffalo region and correct all these problems? Some of them were, some of them were not. For instance, there's no evidence that anyone stuck his finger in a cup of coffee before the union campaign, but there was, Starbucks made the decision once it came into the market and saw the poor conditions, and it brought in new managers. As I mentioned, it fired the district manager, it brought in new district managers from other markets, and a number of store managers during this period left. By my count of the seven discharged employees, four of them had completely new store managers by the time of that discipline. So looking to what a prior store manager who is no longer on the scene did before August 23rd is not probative of what motivation that new store manager had when it took those various actions. Now, what happened, what happens nationwide, there's evidence of this that the ALJ noted, but then failed to take account of, is that across markets, when Starbucks brings in new management, and that new management determines that prior management has not been enforcing policies, it conducts level setting. And level setting is not something nefarious, it's simply reminding employees of preexisting policies, asking them to acknowledge them, and put them on notice that policies are going to be enforced. Policies like dress code policies, time and attendance policies, et cetera. And these employees who were disciplined, and all of the discharged employees, I don't think there's a dispute that they were not in compliance with Starbucks policies. And again, Starbucks disciplined both non-union supporters and union supporters during this, during this time. I'm trying to understand, you know, I have reviewed a lot in this case, and I'm trying to understand what is the problem with unionizing? Why would you all not want it to be done by the employees? Well, I mean, employers have a right under the First Amendment and Section 8C of the NLRA to advocate against unionization. Congress, when it enacted Section 8C of the NLRA, kind of took the position that debate about unions is supposed to be, in the words of the Supreme Court, robust and uninhibited, and that employers have the ability to tell employees, for instance, we value our direct relationship with you. We would prefer that our relationship remain direct, just you and us, not with the union standing in between us. There are many legitimate reasons why employers may prefer not to have unions. And that's what I'm asking, what, what is it that the unions do that is problematic compared to just having your employees? Well, I mean, the unions, for one, make it harder for a company to exercise flexibility and responding to changes. So, for instance, a union contract will typically extend for a number of years, and that contract is negotiated in advance. And so during that time period, the company has less flexibility in how it treats those various employees vis-a-vis the non-unionized employees. Here, the bargaining unit is a store-by-store basis, so eight stores in Buffalo unionized, the remainder did not. And that makes it difficult, for instance, potentially, to have employees transfer or cover shifts across stores if some of the stores are unionized and some of them are not unionized. So those are just a couple of examples of why Starbucks may prefer not to have unions. But I think the really key point is that we had the right to have these discussions with our employees, and we had the right to bring executives to Buffalo to have these discussions. And the mere fact that it was unprecedented for us to discuss unionization in these sessions with employees does not mean that we violated the Act, because the whole fact of this union campaign was unprecedented. This was the very first district-wide union campaign in Starbucks history, and when we brought executives to Buffalo, in part, to discuss unionization with employees, that was our right. An unprecedented activity that is protected by the First Amendment cannot violate the NLRA. I would point the Court to the Fourth Circuit's decision in Intertate Polymer, which rejected a similar surveillance argument from the Board on the ground that conduct that is protected by the First Amendment cannot be unlawful surveillance. I would point the Court to the Board's own decision, which it failed to grapple with in a case called the Broadway, where the Board held that when a company brought additional management into a facility during a union campaign to discuss unionization with employees, the fact that there were additional managers there who could observe open union activity occurring in the workplace could not be unlawful surveillance. Again, the Board reached the opposite conclusion here, based on the fact that there were additional managers visiting the Buffalo market during this time. Well, it wasn't just additional managers. They were wearing headsets so that they were in on all these conversations. Isn't that correct? I mean, it wasn't just that they were there. The fact that they were there, and there were a lot of them, and I know you contend that it's just coincidence that they descended on the Buffalo region right at the time when they began unionization discussions. To be clear, no, to be clear, we do not contend that it was a coincidence. You sent people there, you say, to discuss unions, but there was a lot more happening than just that. Well, that's correct. We've already talked about people who got disciplined and terminated. Correct, because when we got to Buffalo, we discovered that, in the words of one of the new regional managers, the conditions there were the worst she had ever seen. She had described walking into a store and seeing the walls, there were fruit flies stuck to the walls of the store. These stores were understaffed by 300 employees. The store managers, some of the store managers were ineffective. The district manager was ineffective. So you're saying you descended on Buffalo because you knew the union was coming. I guess when I read the briefs, I thought part of what I read was you didn't know at the time the decision was made to go to Buffalo, it didn't have anything to do with unionization. At the time that we appointed the new regional manager to cover Buffalo, yes, that occurred in July, and she assumed that position in August. I don't think they dispute that there's no evidence Starbucks knew of the union campaign when that particular decision was made. She is one of the executives who came to Buffalo right after the union announcement. But I don't dispute that part of the reason why executives came to Buffalo was because of the union campaign. We came to discuss unionization with employees. But once we got there and we saw these terrible conditions, we had to be able to do the things that Starbucks does in that situation, remove beehives from stores, repair broken floors that present a safety hazard to customers and employees, hire new employees, bring in recruiting specialists who help with hiring. There's evidence that we had recruiting specialists around the country. We had centralized training locations around the country. And even the ALJ acknowledged that we have brought in support managers. So your position is, of course, you did these things because they were necessary. What the board said is, well, it looks like you may have been motivated by union animus. That is what the board said. When you did some of these things. Well, so what's the standard of review of the board's decision? Well, the standard of review is for substantial evidence. But legal error by the board is grounds to vacate and remand. And there is legal error. So if there's substantial evidence to support the board's conclusions, then we deny petition for review. Well, not if there's legal error. If there's legal error, then the court would have to vacate and remand. Well, the board's entitled to draw reasonable inferences from the facts. Is that right? It is. But not if those inferences are the product of error. For instance, here, that the ALJM board repeatedly- Well, if it's the product of an error, then I guess it's an unreasonable inference. Sure. I think that's another way to look at it, Your Honor. So they can draw reasonable inferences. Isn't that right? Of course, Your Honor. And so if you can look at a set of facts and you can draw more than one reasonable inference, you can say, well, this is related to union animus. And you say, no, it's not. It's just what's necessary. So the board draws a reasonable inference. We do not think this is a reasonable inference. Again, because of the shortcuts the board took to get there. So talking about what we've just been talking about, the 881 allegations, the board simply drew a bright line at August 23rd and said, any operational decision that occurred after that date, even if it's consistent with things Starbucks does everywhere else in the country, is an improper benefit. Because it hadn't happened before August 23rd. Because it would not have happened but for the union campaign. That conflates but for causation with improper motivation. It penalizes Starbucks for exercising its First Amendment right to bring executives to discuss unionization with employees, where, when they came, they discovered— So you're arguing legal issue on De Novo? Is that what you're saying, that there are some issues? Yes, Your Honor. As opposed to simply making decisions? Yes, exactly. And I would say the same thing goes for all of the Section 883 conclusions, where the board simply inferred animus district-wide based on its findings of Section 81 violations. I would note, if the court agrees with us as to any of the Section 81 violations and either denies enforcement or vacates and remands, then by necessity, because they're linked, the court would, under the Chenery Doctrine, need to vacate and remand all of the Section 883 conclusions back to the board to reconsider. But even putting that aside, the board did not consider animus on a decision-maker by decision-maker basis or a decision-by-decision basis. It simply inferred it in the abstract and then shifted the burden to Starbucks to disprove animus by requiring us to find a pre-August 23rd comparator. The board has no case law for that approach. There's no circuit that has endorsed that kind of burden shifting at step one of the right-line analysis, where the question is, what did animus motivate any particular decision? They simply did not carry that burden because of this improper burden shifting framework that they adopted. I see I'm out of time, but I'm happy to answer any questions. You've saved time for rebuttal. Thank you. We will now hear from Eric Weitz for the National Labor Relations Board. I'm sorry if I mispronounced your last name. No worries, Your Honor. Good morning. May it please the court. Eric Weitz on behalf of the government. I'll be presenting argument for 20 minutes and then at council table is the counsel for the union intervener who will be presenting for five minutes. This is admittedly a large case. The board found over 100 discrete violations and on appeal rather than narrowing the issues as would be typical at the appellate level, Starbucks has chosen to say that none of the board's findings in its 130-page decision is supported by substantial evidence or entitled to affirmance. I would submit this as a litigation strategy to distract from the actual facts of the violations and the applicable substantial evidence standard of review which asks only whether a reasonable fact finder in the board's position could have reached the factual conclusions that the board did and drawn the inferences that the board did even if the court might have reached a different conclusion in the first instance. I think it would be helpful because of this to focus in on some of the significant violations in this case. Well, one thing I'm wondering is why would the board want them to not go fix all these problems coming in? Somebody putting their finger in something, a bunch of ants coming in or whatever. I mean, why wouldn't you want, just as a human, you don't want to go to a store and have a bunch of stuff floating out on you that's bad. So why, even if they only came to Buffalo because of the unionization, then they saw all these problems. Why wasn't it bad? Why is it bad that they fix bad things? Well, to be clear, Your Honor, the board is not saying it's bad or that they're prohibited. And I'd also note that what's actually before the court, the board's remedial order at RE 16 through 19, that's the actual order of the courts being asked to enforce. They're not requiring Starbucks to undo most of these improvements. It's simply a cease and desist saying that you will not do these things when you're motivated by the union and aligned in the notice posting. So what the board found here was that, and again, these are, I would emphasize, these are fairly minor 881s. So I don't want to distract from the broader issues in the case. But what the board found was that many of, all of these issues, in fact, had been known at these stores for months or years by Starbucks. And Starbucks took no action until it was faced with a union campaign in the area. And as the Supreme Court held in exchange parts nearly half a century ago, section 881 of the act is a judgment by Congress that employees should have the right to choose whether or not to form a union free from employer interference. And the Supreme Court has held that even if it's something beneficial that the employees wouldn't complain about, if an employer does that because of the union campaign and an attempt to influence the employee's choice for or against unionization, that is interference under 881. It does not require a showing of anti-union animus. It simply requires a showing that they made this decision and took this action because of the union. And the evidence here is clear. For example, the fruit fly infestations in some of the cases that employees and store managers have been complaining about for an extended period of time. Starbucks took no action to fix those until the union was in place. And in fact, Starbucks makes a big deal about the new manager who came in. Her testimony was that the worst store she saw was in Saratoga Springs on the other side of this geographical area. There is no evidence in the record that Starbucks has taken any action in Saratoga Springs to fix these stores. They only descended upon the Buffalo and Rochester area because that's where employees were unionizing. So regardless of whether it was ill-intentioned or a bad policy, many of the employees would have supported these changes. This is what they were advocating for. All the board found was that that was interference with freedom of choice for or against unionization. And the remedy is simply a cease and desist order saying in the future, do not interfere with employees' choice of unionization. So if there are improvements that need to be made, and there's a unionization campaign, you got to suspend making any improvements, making your place safer, you got to not do any of that. Otherwise, it's going to be viewed as interfering with the employee's right to unionize. Certainly not, Your Honor. It still requires the board to find that this particular action was motivated by the union. So simply because the union campaign is going on, the board does not restrict an employer's, you know, in the normal course of business decision to make improvements in the workplace. What the board found here, as a matter of fact, was that Starbucks knew of these issues, did not fix them until the union came in, and therefore it was motivated by the union. And so that's the ultimate issue on these 8A1s. But again, Starbucks is trying to make it seem as though these 8A1s are the entire case and that everything is linked to these 8A1s, which I want to just emphasize and push back against. That is simply not the case. With the seven unlawful discharges in this case, for example, the board made particularized findings of animus with regard to each discharge and each employee that does not depend on these other 8A1s. So the notion that if the court were to deny affirmance of one of the 140 plus violations that the entire case needs to be remanded is simply not true. And so if I can go through in some detail, starting with unlawful discharges, first at the transit and French store, the union there was certified on March 17th. Within two weeks, the two leading union organizers at the store, Angel Krempa and Minwoo Park had been discharged on false and pretextual grounds that Starbucks has waived any response to in its briefing. So with Angel Krempa, for example, the stated reason for her discharge was that she was less than 20 minutes later, approximately 20 minutes late on two occasions, and she texted the store rather than calling the store as Starbucks policy required because they wanted to make sure by calling that someone was aware that the employee was gonna be late. As the board found at pages RE74 through 75, that was simply false and pretextual. There was testimony of multiple witnesses and phone records entered into evidence showing that Angel Krempa did in fact call the store on both occasions. Starbucks offers no response to that dispositive finding. And under well-established precedent, it is reasonable for the board to infer animus based on these kind of false and pretextual explanations based on an employer's total unwillingness to investigate the alleged grounds for discharge. That is sufficient to establish the prima facie case under the right line standard. And at that point, as the Supreme Court has affirmed in the seminal transportation management case, it is reasonable for the board to then shift the burden to the employer to prove that it would have taken this exact same action in the absence of the employee's union activity. And Starbucks does not even attempt to do that because the stated grounds in the actual discharge notice were as a matter of fact, false and pretextual. Also, Angel Krempa was issued a final written warning a few months earlier, several days after she testified at a board representation hearing. Starbucks claims that the decision had been made prior to when the actual testimony occurred. But if the court looks at RE 74, note 330, the board discredited the manager's testimony as to the date that was created and the inexplicable failure to explain why Starbucks waited two weeks to issue discipline for a single use of a swear word. Employee Minwoo Park at the same store. Again, Starbucks continues to press false and pretextual explanations. To go to one of your earlier questions, Judge Haynes, if you were to read Starbucks' brief, you would think that employee Park was discharged because he put his finger in a customer's drink and served it to the customer as a health and safety violation. That is simply not what occurred here. What occurred was Park was presented- I've read the briefs. Okay, well, so there is absolutely no health and safety violation. The worst that this misconduct would be, would be- Are you saying they're lying about sticking the finger in? I'm saying they're presenting it in a misleading way to suggest that there was a health and safety risk. This may admittedly have been misconduct. You want somebody's finger in what you're eating? Well, Your Honor, it was never served to an employee. He immediately discarded the drink and made a new one. And so that is admittedly misconduct. It's unprofessional, and it wasted a drink. But the stated grounds that this was a health and safety violation is simply absurd and pretextual, given the actual facts of what occurred. And they also stated in the discharge notice for Park that he was late less than 10 minutes on two occasions. That is completely out of line with Starbucks' longstanding policy regarding tardiness, both before and after the union. There's no evidence of any other employee who was discharged for being several minutes late. This was a routine occurrence at these stores. And again, these two discharges occurred less than two weeks after the union was certified. And these were the two leading union organizers at the store. This is a trend turning to the Elmwood store, where two employees were discharged. One was discharged, and one was constructively discharged because of a change in the scheduling policy. Starbucks ignores, first of all, the board's findings at RE 46, 49, and RE 117, that Starbucks managers offered shifting, contradictory, and inconsistent explanations for why employee Cassie Fleischer was suddenly required to work a schedule that Starbucks knew she was unable to work, when it was a longstanding practice that Starbucks would accommodate reduced schedules of one or two days and different days in the week. In fact, they continued to do so for other employees at the store, even after the supposed level setting campaign. And so there is specific particularized evidence of animus that there was an inability to explain why this employee was singled out as one of the most prominent union supporters at the store. In fact, the subject of national news reporting about the organizing campaign and made to leave the store. Moreover, the two discharges at the Elmwood store, Cassie Fleischer and Kellen Higgins, the board provided a completely independent ground for finding that these discharges were unlawful, which Starbucks does not acknowledge in its briefs. Again, at page RE 117 and RE 119 through 120, the board noted that these employees were discharged because of a change in scheduling policy and minimum availability requirements that had simply never been enforced before at the store. And under the National Labor Relations Act, it's black letter law that an employee has to bargain with its employees union before implementing those kinds of changes. At the Elmwood store, the union had already been certified by the time these changes in policy occurred. And whether or not Starbucks likes it, it is bound by the law and it has an obligation in those circumstances to bargain with its employees union before making unilateral changes. Starbucks' only response to this dispositive violation is a single line in its brief, simply asserting that this had always been the policy at the Elmwood store, which is demonstrably false. There's a wealth of testimony confirming the longstanding scheduling policy at the store. In fact, one of the employees, Kellen Higgins, for years had been allowed to make these scheduling changes based on his schooling schedule. And so I would point the court, for example, record on appeal 632 through 635, 644 through 646, 649 through 650. And there are additional record citations in the board's decision. And so again, this is an independent basis for finding that there were two unlawful discharges here that Starbucks does not meaningfully respond to. Turning to the Sheridan and Bailey store, where employee Daniel Rojas was unlawfully discharged, Starbucks makes a cursory claim that there's no evidence the manager had knowledge of his union activity. This is absurd based on the facts. Rojas was an open union leader at the store. He wore union pins. He actually asked managers about posting union literature. He solicited co-workers in store. And he talked about his union sympathies to Williams, who was the president of Starbucks' North American operations and the leader of this anti-union campaign. So what Starbucks is arguing and making these supposed cross-cutting arguments about lack of proof of knowledge is simply inconsistent with established law. When you have a group of managers, particularly here where there's a targeted anti-union campaign, and some or many of the managers know of an employee's open union activity, it is simply an impossible burden of proof to say that the board needs to have smoking gun evidence that every single manager present in the store knew of this because you can reasonably infer that the managers are communicating and sharing the knowledge of these employees' open union activities. So there's more than sufficient, more than substantial evidence of knowledge of Rojas' union activity. And moreover, again, when he was discharged, it was an unexplained departure from Starbucks' normal practice. They relied in part on a discipline from a year earlier, whereas their established practice was not to consider discipline more than six months old. As the board notes at RE117, Starbucks offers no response to that particularized finding. And moreover, there was disparate treatment. Rojas was discharged for being 26 minutes late, even though he arrived before the store opened and even though it had no impact on the store, the store opened as scheduled and there was no impact on operations. And the record is replete with evidence that this is disparate treatment and a departure from established practice at the Buffalo area stores in particular, but also Starbucks' practice in general. Are you going to tell us why they have to reopen the Galleria kiosk? Sure, Your Honor. Assuming just the remedial question that they're challenging, where the board has issued a restoration order, that is simply the default remedy to restore the status quo ante. Starbucks made no argument to the board whatsoever that it would be unduly burdensome or impossible. And so as an initial matter, it's simply barred because it wasn't presented to the board. But moreover, Starbucks' claim that the board's order is forcing them to reopen it, even if it's impossible, is simply not true. We cite cases in our brief. It's well-established under board law that when you have these kind of restoration orders for an unlawfully closed store, as long as the employer makes a good faith effort in compliance, that is sufficient compliance with the board's order. And so the board obviously is not asking Starbucks to do something that if it in fact is impossible, Starbucks could present that evidence in a compliance proceeding. But what Starbucks is trying to do is to get this court to take that provision out of the order based on an unlitigated claim that it would be impossible. This store is still in operation. It is, first of all, I don't think it was ever owned by Starbucks. It was in the mall's property. But formally, it was operated by Starbucks as a Starbucks store. And all they did was convert it to a licensed store where the mall is now the licensee and continues to operate the same store. So all the board's order is asking Starbucks to do is to attempt to reopen the kiosk and so it can be staffed by Starbucks employees. And if that is in fact impossible, that could be litigated in compliance. So what happens to the licensee? Well, they would have to negotiate that with the mall, your honor. And to the extent a third party's cooperation would be required, they could go to the board in a compliance proceeding after enforcement of the board's order and say, we've made a good faith effort with the mall. The mall really likes running this store as a licensed store and they refuse to give us space in the mall and the board would then close the case on compliance. Certainly this court would not find Starbucks in contempt. Well, but what about if it's ridiculously expensive? They allow it, but you know, billions of dollars or whatever. Sure, if there's previously unavailable evidence that it'd be unduly burdensome, the board also permits them to present that in compliance. But again, we simply don't know the facts here because Starbucks chose not to object to this remedy. The board even had a footnote in this decision noting that it was not going to address this remedy in detail because Starbucks was not challenging it. They had an opportunity then to file a motion for reconsideration, making any of these claims and proffering evidence, which they chose not to do. And so all the board is asking for is for enforcement of this default remedy so that it can be litigated in compliance. And I would submit that there is no risk of compliance of Starbucks being held in contempt by this court if in fact it is impossible or would cost billions of dollars to reopen this kiosk. And so all the board's doing is asking for their status quo ante to be restored. Turning to an additional discharge, Nathan Tarnofsky at the East Robinson store. This is another example where if the court actually looks at the board's detailed findings of fact and analysis at RE 8586, RE 119, they will find an unrebutted finding that the stated reason for discharging Mr. Tarnofsky was false and pretextual. The claim was that he had lied on the COVID coach screen when he reported for work that day. That is not the case, as the board found. The COVID coach asked employees to note, as this court may be familiar with back from the COVID era when we saw these kinds of screening documents, to report symptoms that were out of the ordinary. And the unrebutted testimony and board's finding is that that's exactly what Mr. Tarnofsky did by not reporting symptoms that he was experiencing, but that were routine and out of the ordinary. And so, first of all, the claim that he lied on the screen is false and pretextual. Secondly, there's evidence of disparate treatment. There are at least two other employees in the Buffalo area who reported to work with symptoms that would have failed the COVID screen. And in those cases, Starbucks did not discharge them. They sent them home and dealt with it that way. So the notion that Mr. Tarnofsky needed to be immediately discharged is sufficient to infer unlawful animus, given that, once again, he was a lead union supporter at this store. So this is an obvious trend in the case. There's an additional discharge, which I can just note quickly, Brian Nuzzo at the Monroe Avenue store. Again, there's disparate treatment and unexplained scrutiny of Mr. Nuzzo. An out-of-state manager initiated an investigation of him because they saw he had clocked in a few minutes before a coworker. There's no evidence they ever did that for any other employee or why they were so interested in this one employee, other than the fact that he was a lead union organizer. And there was indisparate treatment. There's no evidence that nor... In fact, there's evidence, a wealth of evidence to the contrary, that employees routinely entered the store alone briefly before the store opened to open things and that within the store, employees would briefly remove their masks in the presence of coworkers. And I would also note this incident occurred three days before Starbucks dropped the mask mandate. So the notion... Your time is up. Thank you, Your Honor. If there's no further questions, we'd ask for full enforcement. Okay. Well, we'll hear from Ian Hayes for the Workers Unit United. Good morning, Your Honors. May it please the Court, Ian Hayes for Intervenor Workers United. Your Honors, I want to focus on two basic observations here that I think are big picture, but are easy to miss when we're looking at the trees rather than the forest, in this case, so to speak. There's obviously this issue of whether everything that Starbucks did in the underlying case over these months in the Buffalo area was simply the result of it applying existing policies or in other words, business as usual, or was it part of an unlawful anti-union campaign? Starbucks calls this the board's original sin in its decision. So this is obviously a central question. What I want to observe is that while there are examples in the record of Starbucks doing some of the behavior anecdotally or maybe examples somewhere across the United States at some point, there is nothing in the record showing that Starbucks did all of these things or even the majority of these things anywhere but Buffalo, either before or since. In other words, there are examples of Starbucks maybe having meetings with managers, sitting down with workers and hearing about issues at stores. However, there is no example in the record of Starbucks doing that and hiring hundreds of workers in an area and sending dozens of managers to come and live in a place for months and changing policies about picking up shifts and closing a store and creating a centralized training area and so on. I won't name all the changes. In other words, nothing- What do you see as the biggest problem they did? It's hard to say, Your Honor. Obviously, terminating workers and closing a store, those jump out as single discrete problems that create mass coercion. However, I do want to say what we're referring to as all of these 8A1 violations, the sort of more minor, quote, minor violations, they matter too because especially in volume, they send the message day after day to workers that we don't like what you're doing. You need to change what you're doing. In other words, organizing. So if we were to rule in favor of Starbucks, how would that affect you all? How would it affect the union? Yes. I think it would be- have a buoying effect on morale because these Starbucks workers, all of the workers in the Buffalo area and indeed across the country who have been watching what's happening with this situation have been wondering for five years what's going to happen here. They know that what Starbucks did was unusual and because of the anti-union campaign. They want to know whether that matters, whether the truth matters, whether the law that's supposed to protect them matters. So if they do, this court should enforce the board's order. Starbucks workers and the union, of course, have been waiting for that to happen for five years. One other observation I want to make,  is that, Judge Graves, I have the same confusion here about whether Starbucks is claiming this is all a coincidence or not. And in fact, I would submit today, right here is the first time that we've heard Starbucks say that they came to Buffalo to do all of these things because of the union, in any meaningful way. And on that point, I just want to point something out in the record that again, may be easy to miss. We heard about all of these store conditions that needed to be addressed and in fact, Starbucks did address. Starbucks, I guess until today, has been presenting a story that there was this great outcry from Buffalo, from workers there, complaining about working conditions and that they were essentially forced to come to Buffalo to address them and remedy them right away. That's not what happened. Instead, the public announcement of the campaign was very clear. It's the so-called Dear Kevin letter in the record. It was publicized. It in fact, became international news right away. That letter says nothing about store conditions. Instead, it talks about creating a productive relationship with Starbucks by organizing. So in reaction to that, the record is clear on the timeline. Dozens of managers and executives came to Buffalo and started holding meetings. They heard about store conditions because they were already in Buffalo, not the other way around. Finally, because I only have a few seconds, we've heard again today about this issue of inferring animus. I just want to point out, I hope it's obvious, but in case it's not, that's essentially all the board can ever do under a right line analysis when considering an 8A3 violation because almost no employer is going to say, we are doing this because of the union. Starbucks came very close by acting the way it did and having managers frame every meeting in terms of there's a union organizing campaign going on and that's what makes this different. They didn't say it's because of the union. However, that's a fair inference. That's all the NLRB can ever do. Your time is up. Thank you. And we'll now hear the rebuttal. Okay. Starting with section 8A1, the board said that the test under exchange parts is whether something happened because of the union. That is not correct. I'd like to read from exchange parts. The standard is that promises which are undertaken with the express purpose of impinging upon employees freedom of choice for or against unionization. That is what violates exchange parts. It is not simply that you took something but for, you know, that you did something because a union came in and then as a but for reason that happened. Second, I think it's quite telling that today both the board and the union now call the section 8A1 findings relatively minor. That is not what happened below. The section 8A1 findings are the basis for the ALJ to find this widespread district-wide animus. They are the reason why the board took the extraordinary remedy of imposing a bargaining order at the Camp Road store and the basis for many of these extreme remedies. And so I think it's quite telling they're walking away from those now and calling them minor. And that's because they are not supported. And just to push back on, you know, shifting to section 8A3, the board claimed there's just no link between them because the ALJ supposedly made independent findings of animus. Let me just point the court to the relevant portions of the record. At RE, sorry, sorry, my flags are in the wrong place. At RE106, this is the beginning of the section 8A3 findings of the ALJ. He says, based on the vast and systemic barrage of section 8A1 violations described above, which they now call minor, I find that an inference is appropriate with respect to the overwhelming number of adverse actions that ensued. The only exceptions are instances where the respondent proved that the adverse actions were consistent with past practices. In other words, he took the 8A1 violations and made them the basis for inferring animus for every single thing that happened to any union supporter, even if it's asking them to put milk back in the fridge, and then put the burden on us to disprove animus. And he did that over and over again as to every single employee. So for instance, just to take Angel Krempe as an example, again, in the section of his opinion at RE119, where he discusses Ms. Krempe, he says, given the widespread union animus exhibited by the respondent towards the organizing campaign and its knowledge that Krempe supported the union, the evidence supports inferences that it retaliated against Krempe. Time after time, he simply refers to the union animus in the abstract, no matter who was the decision maker, and that infected all of his findings with respect to these particular employees. Now, I'm not going to go one by one. I don't have time to do that, but let me just highlight a few examples. We could spend all day on this. Understood. Ms. Krempe conceded, she conceded that she had violated the dress code, and she said she intentionally violated Starbucks dress code because she thought she had protection as a union supporter from discipline. That is not the law. And by the way, that is one of the reasons why employers don't want unions, because it makes it difficult to discipline employees who may be part of the union. You know, Mr. Nuzzo, the board said that they launched an investigation of him. The evidence was they launched an investigation of why the store closed, sorry, opened early that day. It was not a targeted investigation of him. It was an investigation of what happened when the store failed to open on time. And in the conduct, in the course of that investigation, they discovered that he had violated two policies, and then he lied about it. And of course, Starbucks should have the right to discipline employees who blatantly lie to them. Well, but the underlying violation there was entering the store alone and setting up without wearing a mask. And that's what he lied about. Correct. And that is an established Starbucks policy for safety reasons, that it requires two employees to be at the store at any given time. So when Starbucks conducted this- And so there was no evidence that other people that entered the store alone without wearing masks? There was no evidence of those- Had that been happening before? I don't believe there was evidence of those two things happening at the same time, but there certainly was no evidence that employees lied about it when their managers asked them about why a store failed to open on time. And that is what happened here. I see I'm out of time. I had a few more points, but with that, I will rest unless the court has questions. Okay. Thank you. We appreciate all the arguments, and we will decide this case. Thank you.